UNITED STATES FIDELITY & GUARANTY COMPANY v. BOARD
OF COMMISSIONERS SEWER IMPROVEMENT DISTRICT
No. 1 OF BLYTHEVILLE.

Opinion delivered February 17, 1919.

1. MUNICIPAL CORPORATIONS—CONSTRUCTION OF SEWER—EVIDENCE.—
In a suit by a board of commissioners of an improvement district
to recover money paid to a contractor under a contract for con-
struction of a sewer system and for damages for delay, evidence
held to sustain finding that the system had never been brought
to a point where it could perform in a substantial way the re-
quirements of the contract.

2. MUNICIPAL CORPORATIONS — DEFECTIVE CONSTRUCTION OF SEWER —
ESTOPPEL.—Sewer commissioners were not estopped by failure to
complain of defective work as it progressed where they were
given to understand that correction would be made.

3. MUNICIPAL CORPORATIONS—CONSTRUCTION OF SEWER—ENGINEER'S
APPROVAL.—The fact that the engineer of an improvement district
knew that the original specifications for the sewer system were
not being complied with would not bind the commissioners where
such engineer was guilty of such inattention and indifference to
the interests of the district as implied bad faith.

4. MUNICIPAL CORPORATIONS—ACCEPTANCE OF SEWER—ESTOPPEL.—An
improvement district is not estopped to maintain suit for money
paid to the contractor under a contract for the construction of a
sewer system by reason of the fact that it took possession of the
system and endeavored to complete it after the contractor quit,
as, under Kirby's Digest, § 5719, the district could not excuse a
failure of performance.

5. MUNICIPAL CORPORATIONS — SEWER CONTRACT — RECOVERY OF PAY-
MENTS.—Where a contract for construction of a sewer system
gave the right of acceptance or rejection of the work on a final
test, and where there had been no substantial compliance with the
contract and the system was rejected on final test, the improve-
ment district was entitled to recover payments made with interest
from the date of each payment.

6.  Municipal corporations — nonperformance of contract — lia-
    bility of surety.—Where provision for liquidated damages ap-
    peared only in the specifications and not in the contract for the
    construction of a sewer system nor in the contractor's bond, a
    surety on the bond would not be liable for liquidated damages.

Appeal from Mississippi Chancery Court, Chicka-
sawba District; *Archer Wheatley*, Chancellor; affirmed.

*Wm. M. Hall* and *Lamb & Frierson*, for appellants.

1. · The facts proven show substantial performance
of the contract and the engineers of the district so found
and reported and the sewer was accepted. Knowing of
all defects and having $12,000 to remedy these defects as-
sumed the task of remedying them and expended over
$8,000 foolishly and for additional matters which were
the fault of the board's engineer and not of the contrac-
tor. A careful inspection should have been made and at-
tention of the contractor called thereto. It was unjust for
the board to sit back without complaint, to assume the
possibility of defective work and rely upon a reserved
right to make a test on the completion of the entire sys-
tem, and if that test was not satisfactory to disregard all
the acts of the board's agents in accepting the work from
time to time. That is not fair dealing. The finding of
the chancellor is contrary to the evidence.

2. The chancellor was correct in holding the surety
company not liable for the liquidated damages at $50
per day. That provision was in the specifications but not
in the contract or bond. 100 Ark. 284.

3. He was also correct in finding that district was
not entitled to recover moneys expended by it in endeav-
oring to complete the system. The expenditures by Mo-
nie under the direction of Phillips were made in absolute
disregard of all intelligent direction toward the comple-
tion of the contract that it was unjust to hold the surety
or even the contractor responsible. The appellee is
estopped under the law and evidence. 101 Pac. 308;
23 L. R. A. (N. S.) 317; 90 N. W. 700; 25 Mich. 419;
72 N. W. 372; 81 *Id.* 136; 21 Atl. 306; 37 N. E.

16; 35 *Id.* 1006, 1012; 79 N. W. 330; 4 Atl. 903; 95 N. W. 78; 57 S. W. 746; 90 N. W. 700; 95 *Id.* 78; 50 So. 166; 3 Col. 15; 126 N. W. 796; 81 *Id.* 136; 1 L. R. A. 826.

Partial payment during the progress of the work with knowledge of defects or improper material is evidence of acceptance and waiver. 90 N. E. 864.

Where there is substantial compliance in good faith, a contractor may recover disregarding immaterial changes, deductions being made for defects. 18 N. W. 543; 24 L. R. A. (N. S.) 543, note 327; 97 Ark. 278; 72 Pac. 126.

Acceptance for the purpose of completing the work is a waiver of any claim that there is not substantial performance. Cases *supra*. Appellee having made current payments and having accepted the work is not entitled to recover the full amount paid the contractor. 60 Ark. Law Rep., No. 4, 280.

If the work was worthless any payment was overpayment releasing the surety. 164 U. S. 227; 120 Ark. 519; 73 *Id.* 473; 79 *Id.* 523; 122 *Id.* 522.

In conclusion the findings are clearly against the preponderance of the evidence, because the evidence shows a substantial performance and, second, because of the estoppel by the conduct of appellee in acquiescing in the work during its progress and by taking over the work for completion. Further, as to the surety, if the work was in fact worthless the surety was released by over-payment. Authorities *supra*.

*A. Y. Little* and *P. A. Lasley*, for appellee.

1.    There was no substantial performance of the contract. 97 Ark. 278; 102 *Id.* 152; 57 N. E. 412; 41 L. R. A. 238; 118 N. W. 543; 24 L. R. A. 327.

2.    Plaintiffs are not estopped because they did not complete the work. They were not aware of the defective work. 100 Ark. 166; 207 S. W. 33; 185 *Id.* 474; 51 U. S. (L. Ed.), 811; 10 Am. Rep. 449; 84 N. W. 724; 45 N. E. 1013; 175 Fed. 650; 72 Ark. 525; 97 *Id.* 43.

Where an engineer fails to exercise honest judgment or makes such gross mistakes as to imply bad faith, his

decision is not binding.  88 Ark. 213-224; 48 *Id.* 522; 41 Am. Rep. 29; 64 Ark. 34; 111 *Id.* 373; 114 *Id.* 330.

3.  Plaintiffs are not estopped by taking possession and endeavoring to complete the work after Brooks quit. 97 Ark. 278; 64 *Id.* 34.  They had the right to complete the work.  111 Ark. 373.  The acceptance does not bind nor estop from claiming damages where the defects are latent.  161 Pac. 1151; L. R. A. 1917, C. 322; 15 Ann. Cas. 970, and note; 83 S. W. 634; 115 Am. St. Rep. 254; 114 Ark. 330.

The Surety Company is not released by the failure to retain 15 per cent. of the contract price.  84 Ark. 158; 111 *Id.* 373.  Not being estopped, plaintiffs are entitled to recover the partial payments made with interest.  79 Ark. 506; 166 S. W. 556; 102 Ark. 152-9.

The contract provision for $50 per day's delay is for liquidated damages and not penalty.  57 Ark. 168; 122 *Id.* 308; 128 *Id.* 240.  The Surety Company however is not liable for the liquidated damages as the provision is only in the specifications and not in the contract or bond.  100 Ark. 284.  But Brooks is liable.  Since plaintiffs rejected the system defendants may remove same. 102 Ark. 51; 85 *Id.* 570.

The plans and specifications were not complied with substantially nor was it such a system as was contemplated by the plans and contract.  97 Ark. 278.  Appellee was entitled to what it contracted for.  202 S. W. 712, and same case ms. op.

There was no equitable estoppel.  2 Pomeroy, par. 805; 33 Ark. 465; 82 *Id.* 366; 97 *Id.* 465; 202 S. W. 712; 100 Ark. 166; 51 U. S. (Law Ed.), 811; 10 Am. Rep. 449; 84 N. W. 724; 45 N. E. 1013; 175 Fed. 650; 72 Ark. 579.

While the lower court did not find any actual fraud on part of the engineer, it did find such indifference as to imply bad faith.  If an engineer makes such gross mistakes as to imply bad faith or a failure to exercise an honest judgment, his decision does not bind the board in the inspection and acceptance of work or material during the progress of the work or upon final inspection.  48 Ark.

522; 88 *Id.* 213; 79 *Id.* 514. The decision of the engineer is not binding. 95 N. W. 1097. See also 79 Ark. 516; 175 Fed. 650.

Appellant was liable for the whole amount paid the contractor. 79 Ark. 506; 132 U. S. 271; 3 Wendell 412; 102 Ark. 51; 166 S. W. 566.

The bond was for the faithful performance of the contract including all the plans and specifications. 62 Ark. 330; 6 Cyc. 9; 4 Elliott on Cont., 1007, par. 3798, and p. 800, par. 3620; 25 N. E. 663. Corporations as sureties are not now favored. 73 Fed. 95; 79 Ark. 530. The cause should be affirmed on appeal and on the cross-appeal appellee should have additional judgment for $10,-550 for liquidated damages for delay.

SMITH, J. Sewer Improvement District No. 1 of the city of Blytheville was formed in 1912 to construct a sewer system for that city, and Messrs. Lange, Mahan and Fields were appointed commissioners. These commissioners employed R. C. Huston, a civil engineer of Memphis, Tennessee, to prepare plans and specifications for the district, and the plans thus prepared were submitted to Hiram Phillips, a civil engineer of St. Louis, Missouri, who was at the time the consulting engineer for the water works system of Blytheville. Huston redrafted his plans to conform to the suggestions made by Phillips, and the numerous engineers who have testified in this case agreed that these plans were practical and substantial and, having been properly executed, should have given the district a good and sufficient sewer system. The contract for the construction of the improvement was let on August 27, 1914, to appellant A. C. Brooks, but on account of the difficulty experienced by Brooks in obtaining a surety the contract was not actually entered into until April 1, 1915, and the bond guaranteeing its faithful performance was filed April 15, 1915. This bond was executed by the appellant surety company.

The specifications for the improvement were very elaborate and provided that in case of delay beyond the period permitted by the contract the contractor should

pay fifty dollars per day as liquidated damages for each and every day the work remained incomplete; but this provision appeared only in the specifications and not in the contract nor in the bond.

Huston gave this work only supervisory attention and placed in immediate charge of it his nephew, a young engineer of only limited experience named Gay. The construction work began about May 1, 1915, and it soon became apparent that much of the pipe would have to be laid through quicksand. The contractor and engineer appear to have known that quicksand would be encountered, but no one had anticipated the extent of this condition. On this account Huston recommended to the commissioners in all wet excavations the use of jointite, which is a patented compound, instead of cement and oakum, for sealing joints. This recommendation was not acted upon favorably, and that circumstance comes to have a very important bearing on the case. Huston testified that the refusal of the commissioners to adopt his suggestion was responsible for the failure of the system to meet the requirement of the plans to the extent to which he admitted that there was a failure. The commissioners admit this recommendation was made, but say that the jointite was much more expensive than the cement and oakum and that they were assured by Huston that while jointite was preferable, the cement and oakum would make an air-tight joint, which was the end desired.

There is a conflict in the testimony as to whether or not the original plans and specifications provided for a by-pass. The plans contemplated pumping the sewage from a pump-pit into a septic tank, where it would run into Pemiscot Bayou.

The pumps were to be electric pumps. Whether originally contemplated or not, the by-pass was adopted before construction began, which by-pass led out from the valve in the receiving well and ran into the bayou without going through the septic tank. This by-pass was necessary only when the pumps were, for any reason, not running, or when the septic tank was being cleaned. Gay

testified that when he ran the lines and checked his levels he found that the system lacked 1-4/10 feet of having an outlet into the bayou into which it was proposed to discharge the sewage. This was remedied in part by reducing the entire excavation one foot less than the depth called for by the plans. The commissioners admit the authorization of this change, but deny that they consented to any other. A change in the grade of the by-pass was made, as a result of which so slight a fall existed that the sewage would back up in the main trunk line for a distance of fifteen hundred feet, and the responsibility for this condition is one of the subjects about which the witnesses widely differ.

After Brooks had abandoned his work the commissioners undertook to remedy this defect and spent over five thousand dollars in an unsuccessful attempt to do so.

Shortly after the construction work began citizens of the town made complaint of the use of poor material and defective workmanship, and the commissioners employed one Reuter as an inspector, and there is much conflict as to the extent of Reuter's authority and also over his acquiescence in certain methods of doing the work.

Eight civil engineers testified as experts in the case, and the irreconcilable conflict is found in their opinions, which usually appears when experts are turned loose on any subject. The record is exceedingly voluminous, and we will not review it in detail.

The chancellor specifically found the fact to be that the system had never been brought to a point where it could perform in a substantial way the requirements of the contract; and we think the testimony amply supports that finding. The system had been planned to accommodate a population of 21,700, while it is virtually admitted by all the engineers that the system is inadequate for a population in excess of 7,000. The responsibility for this condition constitutes the chief question of fact.

Huston, the district's engineer, became the most stalwart witness against the district, and he attributes such failure of the system as he admits exists to the refusal

of the commissioners to adopt his recommendation in laying sewer pipe. One of the chief complaints in this respect is that jointite was not used. But it appears that this was a proprietary compound, not in general use by engineers and contractors, and that expert opinion differs as to its value. It was shown, however, that jointite could be satisfactorily used only under conditions more favorable than those existing there, as it had to be heated and reduced to a fluid state and applied to a joint while hot, and engineers testified that it could not be used advantageously in the mud and water which would unavoidably be encountered there. Moreover, the plans did not call for the use of jointite, and the commissioners testified that Huston advised them that while jointite was preferable, satisfactory results would be obtained by adhering to the plans and using cement and oakum, and nearly all the experts expressed the opinion that proper joints could have been obtained by adhering to the specifications and properly executing them.

Much of the main trunk line sewer was laid in water from one to six inches in depth, and much of the trouble is attributed to that fact. It is insisted, however, that because Reuter knew of this the commissioners must be held to have consented to this method of laying the foundation in wet excavation. It was shown, however, that all parties knew that Reuter was not an engineer, nor was he familiar with the specifications, and he did not assume to direct the method in which the work was done. It was his duty to observe the progress of the work and to make daily reports thereon, and he discharged this duty faithfully according to his conception of his authority. He observed the change in the method of making the foundation in wet excavation, but he testified that he was informed by both Gay and Brooks that the commissioners had consented to this change. He also observed the omission of jute from the joints in the laterals, but was informed by the same parties that this had been consented to. The commissioners did not claim to have any practical knowledge in sewer construction, and testified that

they relied not on Reuter alone, but also on Huston and Gay. Yet it appears that Huston gave so little attention to the work that he was not aware that the method of constructing the foundation of about three thousand feet of the main trunk sewer had been changed, and that instead of flooring the entire trench and using cradles to support the pipe through the quicksand area, as required by the specifications, the pipe had been laid flat upon one or two boards placed in the center of the trench.

The trunk sewer was approximately two miles long, and as the land in the district was level and practically without grade, a trench eighteen feet deep was required at the outlet. All the engineers agreed that the fall per mile provided by the plans was the minimum upon which a practical system could be constructed, and this condition made the amount of permissible leakage or infiltration of the utmost importance. The specifications provided certain tests for leakage, which the engineer was required to make, before approving the system, and the commissioners had employed Phillips to be present when these tests were made. Huston declined to make these tests because his recommendation for the use of jointite had not been followed, whereupon Phillips stated that any other tests would be perfunctory, as the system would be valueless unless it stood the leakage test, and he left Huston to make such further tests as he wished to make. It is insisted by the commissioners that these subsequent tests made by Huston were superficial and perfunctory. However, after having made them Huston filed a report with the commissioners substantially approving the work and recommending its acceptance, notwithstanding his report stated the fact to be that because the trunk line sewer had not been built on a true grade the velocity of the flow in the trunk line was so much less than that required in the specifications that the carrying capacity of the sewer was reduced fifty to sixty per cent from this cause alone, and this concession appears to have been made without taking into account the leakage through bad joints and the improperly built man-holes. He ad-

mits that "this infiltration will add a burden to the system, cost of pumping and a reduction of capacity of sewers." It also appears that seventeen sections of the sewer were found to be on so uneven a grade and so filled with sand and silt that a light could not be flashed from one manhole to another, this being one of the tests prescribed by the specifications.

After making these tests and concluding that there had not been a substantial compliance with the contract, the commissioners called upon the contractor and his surety to comply with it, but no response was received. Thereafter the commissioners employed another contractor to complete the work, and several thousand dollars were spent in this attempt, but the work was finally abandoned. The system is not now in use and it appears to be one which not only does not comply substantially with the plans and specifications but one without value.

Having failed to make the sewer system a practical entity, the commissioners for the improvement district brought this suit to recover the money paid the contractor, together with the liquidated damages for delay. A judgment was rendered for the sum paid against both the contractor and his surety, and against the contractor alone for the liquidated damages, and all parties have appealed.

On behalf of the contractor and his surety, it is earnestly insisted that although the work as tendered did not substantially conform to the plans and specifications, the district is now estopped to assert that fact because of the failure of the commissioners to complain as the work progressed. The chief basis of this contention, as appears from the facts already stated, is that the commissioners were receiving daily information from Reuter's reports. It is true that Reuter did from time to time mention defective work; but there was the implication always that correction would be required; and the commissioners make it very plain that they were never aware that the pipes were not being properly laid. It is true that the resident engineer knew the original specifications were not

being strictly complied with; but such knowledge would not bind the board as a ratification of the change. *Williams* v. *Board of Directors Levee Dist.*, 100 Ark. 166. Especially would it not do so in view of the finding, which we think the testimony warranted the chancellor in making that, though the engineer may not have been guilty of fraud, he was, in fact, guilty of such inattention and indifference to the interests of the district as implied bad faith. *Boston Store* v. *Schleuter*, 88 Ark. 213-224; *Hot Springs Ry. Co.* v. *Maher*, 48 Ark. 522; *Ozan Lumber Co.* v. *Haynes*, 68 Ark. 185; *Chapman & Dewey Lumber Co.* v. *Wilson*, 91 Ark. 30; *Lanier* v. *Little Rock Cooperage Co.*, 88 Ark. 557; *Dunham* v. *Williams Cooperage Co.*, 83 Ark. 402; *Carlile* v. *Corrigan*, 83 Ark. 136.

The court specifically found the fact to be that Huston had spent only about two days per month on the job, but had undertaken to make a final and binding test and inspection in two days, and that this test was so incomplete and superficial that he did not discover scaffolding left in one of the manholes or that sewer pipe ran through another manhole without opening into it.

Nor do we think that the district is estopped from maintaining this suit by the fact that it took possession of the system and endeavored to complete it after the contractor quit. The regular engineer had declared the work acceptable, but that finding was not believed by the commissioners and was not accepted by them as correct, and the commissioners notified both the contractor and his surety that they proposed to make an additional test and inspection in which they were invited to participate, and in this notice it was stated that "if found not to be completed in accordance with your contract the board will take same over for the purpose of completing same and will look to you and your bond for the cost thereof."

Thereafter the commissioners made an honest and expensive effort (in which several thousand dollars were expended) to complete the contract; but they failed in this effort. The sewer system was buried under the ground and the defects in it were largely latent, and some

were discovered only as the work to correct the known defects proceeded. It cannot, therefore, be held that there was such acceptance of this work as would, because of the acceptance, defeat the maintenance of a suit for the money paid the contractor.

Section 5719 of Kirby's Digest is applicable here. It reads in part: "All contractors shall be required to give bond for the faithful performance of such contracts as may be awarded them, with good and sufficient securities, in double the amount of the contract work, and the board shall not remit or excuse the penalty or forfeiture of said bond or the breaches thereof."

Construing the portion of the section quoted in the case of *Board of Improvement Commissioners* v. *Galbraith,* 133 Ark. 302, 185 S. W. 474, we said: "Under this provision the board of commissioners could not, by its conduct, excuse any failure on the part of the contractor to perform his work according to the contract, after the work had been done. This provision, however, would not prevent the board, during the progress of the work, from making changes therein by agreement with the contractor, and if the board, during the time the work was progressing, acquiesced in or consented to certain changes, the district would be precluded by such acts on the part of the board from recovering against the contractor for damages based upon these changes as alleged breaches of the contract." So that, while the district may not recover against the contractor, damages for changes in the plans made by consent, yet, when the work has been done, the commissioners are deprived by the statute of the right to excuse the contractor's failure to perform his work according to the contract.

Having reached the conclusion that there has been no substantial compliance with the contract, and that the commissioners are not estopped to reject the system, it follows that the court properly awarded judgment for the recovery of the partial payments made, with interest from the date of each payment. It is true the contract provided for partial payments upon the engineer's estimates;

but it also expressly provides for the right of acceptance or rejection on final test when the system was ready to be turned over to the commissioners. The contract was an entire one and the payments were made pursuant to the contract upon the agreement and assumption that the work would progress to its completion, when the final test would be made, at which time it would then be determined whether the contract had been complied with. *Ark. Mo. Zinc Co.* v. *Patterson,* 79 Ark. 506; *Blackburn* v. *Texarkana G. & E. Co.,* 102 Ark. 152.

Upon the cross-appeal it may be said that the court properly refused to award damages against the surety company on account of the delay in construction for the reason that this provision appears only in the specifications, and not in the contract or bond. *Nick Peay Construction Co.* v. *Miller,* 100 Ark. 284.

The decree upon both the appeal and the cross-appeal will, therefore, be affirmed.